FILED

2013 OCT 21  PM 12: 59

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

JAURIGUE LAW GROUP
MICHAEL J. JAURIGUE (SBN 208123)
ABIGAIL A. TREANOR (SBN 228610)
114 N. Brand Blvd., Suite 200
Glendale, CA 91203
Phone: (818) 630-7280
Fax:     (888) 879-1697
michael@jauriguelaw.com
abigail@jauriguelaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALERIE BRANCA and LISA DIFFINE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>OCWEN LOAN SERVICING, LLC, a Florida limited liability company; OCWEN MORTGAGE SERVICING, INC., a United States Virgin Islands corporation; OCWEN FINANCIAL CORP., a Florida corporation; and DOES 1-10,<br><br>Defendants. | Case No: 2:13-cv-07502-BRO-E<br><br>**FIRST AMENDED COMPLAINT**<br>**[Class Action]**<br><br>1. Unlawful Interception or Reception and Intentional Recording of Communications, Cal. Penal Code § 632.7<br><br>2. Unlawful Eavesdropping or Recording upon Confidential Communications. Cal. Penal Code § 632<br><br>3. Fair Debt Collections Practices Act, False, Deceptive or Misleading Practices, 15 U.S.C. § 1692e<br><br>4. Fair Debt Collections Practices Act, Failure to Provide Written Notice, 15 U.S.C. § 1692g<br><br>5. Injunctive Relief, Cal. Business and Professions Code §§ 17200 *et seq.*<br><br>**Demand for Jury Trial** |

FIRST AMENDED COMPLAINT
1

1   Plaintiffs Valerie Branca and Lisa Diffine (collectively, "Plaintiffs"), by and

2   through their undersigned attorneys, allege as follows:

3   **INTRODUCTION**

4   1.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs

5   bring this case individually and as a class action on behalf all others similarly

6   situated against Ocwen Loan Servicing, LLC, Ocwen Mortgage Servicing, Inc., and

7   Ocwen Financial Corp. (collectively, "Defendants" or "Ocwen Companies").  This

8   class action seeks relief for claims arising from Defendants' practice and policy of

9   surreptitiously recording and/or intercepting and monitoring telephone

10   conversations of California consumers.  Defendants' actions violate California Penal

11   Code sections 630 *et seq.* under the California Invasion of Privacy Act ("CIPA")

12   and the Fair Debt Collections Practices Act ("FDCPA"), 29 U.S.C. § 1692e.

13   Specifically, Defendants have violated: (a) California Penal Code section 632.7,

14   which prohibits the non-consensual interception or reception and intentional

15   recordation of communications transmitted between two telephones, where one

16   telephone is a cellular radio or cordless telephone; (b) California Penal Code section

17   632, which prohibits the intentional eavesdropping upon or recording of confidential

18   communication; (c) and the FDCPA for using false, deceptive, or misleading

19   representation or means in connection with the collection of a debt.

20   2.   Plaintiffs also bring this class action under the FDCPA for failing to

21   provide written notice to consumers nationwide as required by 15 U.S.C. § 1692g.

22   3.   Plaintiffs are entitled to, *inter alia*, statutory damages, injunctive relief,

23   and attorneys' fees for Defendants' violations.

24   **JURISDICTION**

25   4.   This action was filed by Plaintiffs in the Superior Court of the State of

26   California for the County of Los Angeles on September 6, 2013, bearing case

27   number BC520691.  Thereafter, on or about October 9, 2013, Defendants removed

28

FIRST AMENDED COMPLAINT

2

1 the action to this Court pursuant to the Class Action Fairness Act ("CAFA"), 28

2 U.S.C. §§ 1332(d), 1453, and 1711–15, alleging that minimal diversity exists and

3 that the amount in controversy exceeds the $5,000,000 threshold.

4     5.    Venue is proper in the United States District Court for the Central

5 District of California because Defendants conduct business within the Central

6 District of California and Defendants' acts giving rise to Plaintiffs' claims for relief

7 herein occurred within this District.

8                                    **PARTIES**

9     6.    Plaintiff Valerie Branca ("Branca") is an individual who, during the

10 time periods relevant to this Complaint, was a resident in the County of Los

11 Angeles.

12     7.    Plaintiff Lisa Diffine ("Diffine") is an individual who, during the time

13 periods relevant to this Complaint, was a resident in the County of San Bernardino.

14     8.    Defendant Ocwen Financial Corporation ("OFC") is a Florida

15 corporation with its principal place of business in Atlanta, Georgia.   OFC

16 systematically and continuously conducts business throughout the United States and

17 also specifically with California residents.

18     9.    According to its 2012 annual report, OFC is the leader in the servicing

19 industry for mortgage loan investors.  OFC is the 6th largest mortgage servicer in

20 the United States.  OFC is an asset manager and business process solution provider

21 with its headquarters in Atlanta, Georgia and offices in West Palm Beach, Florida

22 and Washington D.C. and support operations in Germany, Uruguay, and India.

23 OFC engages in a variety of business related to residential and commercial

24 mortgage servicing, and focuses on loan servicing, special servicing, and mortgage

25 services.  OFC earns 99% of its revenue through its servicing segment, which means

26 that OFC earns fees for providing services to owners of mortgage loans and

27 foreclosed real estate.  OFC is one of the largest third-party services of *subprime*

28

1   residential mortgage loans in the United States.  OFC is a publicly traded company

2   on the New York Stock Exchange as "OCN."

3       10.     OFC is the parent company for both Defendant Ocwen Loan Servicing,

4   LLC ("OLS") and Defendant Ocwen Mortgage Servicing, Inc. ("OMS").

5   According to its 2012 annual report, OFC directly or indirectly owned all of the

6   outstanding stock of its primary operating subsidiaries, which includes OLS and

7   OMS.  OFC, through its subsidiaries such as OLS and OMS engages in the servicing

8   and origination of mortgage loans.

9       11.     Defendant OLS is a Florida limited liability company with its principle

10  place of business in West Palm Beach, Florida.  OLS systematically and

11  continuously conducts business with California consumers, as well as consumers

12  throughout the United States.

13      12.     OLS is the mortgage loan servicing operation of OFC and specializes in

14  the servicing of subprime and seriously delinquent mortgage loans.  As of June

15  2012, Ocwen Loan's servicing portfolio contained approximately 789,712 loans

16  with an unpaid principal balance of approximately $119.8 billion.  OLC's portfolio

17  consists mainly of subprime loans (54.2%) and non-performing loans (24.9%).

18      13.     OLS's customer service and collections activities take place at

19  servicing sites located in Houston, Texas; Bangalore and Mumbai, India; and

20  Montevideo, Uruguay.  OLS's loss mitigation teams are located at West Palm

21  Beach, Florida; Houston, Texas; and the Bangalore and Mumbai, India sites.  The

22  majority of the collections and loss mitigation representatives are offshore with

23  approximately 90% in India and Uruguay.  In approximately 2012, OLS merged its

24  customer call centers so service agents now handle all calls for all stages of

25  delinquency.

26      14.     Defendant OMS is a United States Virgin Islands ("USVI") corporation

27  with its principal place of business in Frederiksted located in the United States

28

FIRST AMENDED COMPLAINT
4

1   Virgin Islands.  OMS systematically and continuously conducts business with
2   California residents in the State of California.
3          15.    OMS was formed on February 27, 2012, as a wholly owned subsidiary
4   of OFC.  OFC owns all of the common stock of OMS.  OFC formed OMS as part of
5   an initiative to consolidate the ownership and management of its global servicing
6   assets and operations under a single entity and expand its U.S.-based servicing
7   activities.  Because OMS is located in a federally recognized economic development
8   zone, it is qualified for certain economic and tax benefits.  OMS services residential
9   mortgage loans.  According to OFC's 2012 Annual Report, pursuant to the
10  formation of OMS, OFC transferred significant assets to OMS in a taxable
11  transaction.
12         16.    On information and belief, the policies and procedures adopted by OFC
13  are one and the same with respect to the policies and procedures at OLS and OMS.
14  OFC, OLS, and OMS are indiscernible and the formation of the three "separate"
15  entities is meant only to shield OFC from large amounts of liability.  In addition, on
16  information and belief, OFC formed OLS and OMS to receive certain tax benefits.
17  On information and belief, the three Ocwen companies share the same personnel,
18  management, locations, policies, and procedures.  In fact, written correspondence
19  from OLS provides the website address www.ocwen.com, which appears to be
20  maintained by OFC.
21         17.    Plaintiffs are informed and believe and thereupon allege that, at all
22  relevant times, each Defendant was the agent, employee, representative, partner,
23  parent company, subsidiary or affiliate of the other Defendants and was acting, or
24  was acted for, within the authority of such agency, employment representation,
25  partnership, or corporate affiliation while doing or omitting to do the acts alleged
26  herein and with the permission, approval, consent, and/or ratification of all other
27  Defendants.
28

FIRST AMENDED COMPLAINT

18.     There exists, and all times herein mentioned existed, a unity of interests and ownership between all of the Defendants and their principals, such that all individuality and separation ceased and Defendants became the alter egos of the other defendants and their principals.

19.     Adherence to the fiction of any separate existence of any of the Defendants as a distinct entity apart from the other Defendants or their principals and/or the fiction that Defendants or their principals and/or the fiction that Defendants have "limited liability" from the other would permit an abuse of the corporate privilege and other privileges allowing the formation of business entities under the laws of the states of California and the states of formation of Defendants. Injustice would also result given that Defendants and their principals have specifically created the multiple entities in an effort to avoid their liabilities and responsibilities.  Such a result would promote injustice.

20.     Plaintiffs are informed and believe, and thereon allege, that Defendants acquired and assumed the rights and liabilities of the mortgage servicing portfolios of several companies, including, but not limited to:

a.  HomeEq Servicing in or around September 2010;

b.  Litton Loan Servicing LP in or around September 2011;

c.  Saxon Mortgage Services in or around April 2012;

d.  Aurora Bank FSB Servicing in or around June 2012;

e.  Homeward Residential Holdings, Inc. in or around December 2012;

f.  Ally Financial Inc. in or around March 2013; and

g.  ClearPoint in or around February 2013.

21.     The true names and capacities, whether individuals, corporate, associate or otherwise of DOES 1 through 10 inclusive are unknown to Plaintiffs and therefore Plaintiffs sue the DOE defendants by such fictitious names.  Plaintiffs will amend the complaint to allege the true names and capacities of DOE defendants

1  when such names and capacities have been ascertained.  Plaintiffs are informed and
2  believe that each of the DOE defendants is responsible in some manner for the
3  actions and occurrences alleged herein, and for resulting damages suffered by
4  Plaintiffs.
5       22.    Plaintiffs are informed and believe, and thereon allege, that Defendants
6  and DOES 1 through 10 were at all relevant times to this action acting as
7  subsidiaries, sister companies, acquired entities, principals, officers, directors,
8  shareholders or representatives of the Ocwen Companies.
9                              **FACTUAL ALLEGATIONS**
10      23.    On or about August 17, 2012, Moody's Investor Service, a leading
11 provider of credit ratings, research, and risk analysis of financial markets issued a
12 Servicer Report for OLS ("2012 Moody's Report for OLS").  A copy of the 2012
13 Moody's Report for OLS is attached hereto as **Exhibit 1**.  According to the Report:
14           An independent group monitors six to nine customer service
15      and collections calls per agent per month; **the company records and**
16      **stores *all* of its inbound and outbound calls for one year.** Customer
17      relations team leaders monitor an additional five calls per agent per
18      month.
19           Ocwen tracks agent performance through regular production
20      and compliance reviews, monthly agent reviews, and work audits.
21           The customer service, payoff and fulfillment groups participate
22      in the company's incentive program. A Winner's Circle program
23      provides additional incentives to the top 20% of performers on the
24      customer service team, and a quarterly rewards and recognition
25      program recognizes top performers for achieving their goals.
26           **New hires in the customer care group receive four weeks of**
27      **classroom training and three weeks of additional on-the-job**
28

1  **training.** The curriculum includes mortgage basics, systems, customer
2  service, loss mitigation and accent neutralization, when applicable.
3  **Additionally, both customer service agents and collectors receive**
4  **training in taking down borrowers' financial information which**
5  **Ocwen uses to determine the appropriate loss mitigation**
6  **alternative. Agents receive functional cross-training as well as**
7  **ongoing supplemental training.**
8  (Exhibit 1 at p. 5; emphasis supplied.)  In addition, the 2012 Moody's Report on
9  OLS provides:

10  Ocwen's collectors work out of four locations: Houston, Texas,
11  Bangalore and Mumbai, India, and Montevideo, Uruguay, which
12  handles calls with Spanish-speaking borrowers.  Around 90% of
13  Ocwen's collections staff is offshore.

14  **Customer care agents manage accounts in all stages of**
15  **delinquency, and operate in a blended inbound/outbound**
16  **environment.** The company transfers agents between the inbound and
17  outbound queues based on call volumes. The agents conduct call
18  campaigns, handle written correspondence with borrowers, order
19  door-knocks to verify a property's occupancy, and carry out skip-
20  tracing to locate a borrower; they are also responsible for self-
21  fulfillment payment options via the IVR and the website.

22  **The collections group works with the "consumer psychology**
23  **department," which focuses on influencing borrower behavior**
24  **using customized scripting, IVR prompts, written**
25  **correspondence, and website content.**
26  . . . .
27
28

FIRST AMENDED COMPLAINT
8

1    The company's collections division has an excellent technology

2    infrastructure and solid procedures, including interactive scripting,

3    postal planet codes, best-time-to-call software and weekend hours.

4    . . . .

5    **An independent group monitors at least six calls per**

6    **collector per month, while group leaders, who meet regularly with**

7    **staff to discuss areas for improvement, monitor an additional**

8    **number of calls**. The company's monthly incentive compensation

9    plan **based on call monitoring scores**, resolutions and call

10   effectiveness.

11   Ocwen promotes many of its loss mitigation agents from within

12   other parts of the company. These agents receive an additional three

13   weeks of classroom training and one week o-the-job training. All

14   agents participate in FDCPA training, for which they re-test semi-

15   annually.

16   (Exhibit 1 at pp. 6–7.)  Further:

17   **Ocwen calls borrowers daily after the 20th day of**

18   **delinquency**.

19   (Exhibit 1 at p. 8.)

20   **Ocwen has 3 trainers in the US and 60 in India**. It bases its

21   hiring decisions for collectors largely on the candidate's intellect and

22   personality profile, and not necessarily on experience, with the

23   understanding that new hires will receive the requisite job skills

24   through the company's solid training programs. **The company  offers**

25   **six weeks of classroom training for new hires in the customer**

26   **service, collections, and loss mitigation areas, followed by four**

27   **weeks of on-the-job training during which new employees partner**

28

FIRST AMENDED COMPLAINT
9

1   **with more experienced staff.** A third-party vendor offers an

2   additional two weeks of accent neutralization training to employees in

3   India. All employees receive ongoing training covering compliance,

4   time management and leadership. Ocwen also offers cross-training in

5   different functions.

6   (Exhibit 1 at p. 14.)

7       24.    According to the 2012 Moody's Report of OLS, OLS records each and

8   every inbound and outbound call. All of the OLS customer service agents receive

9   the same training and each one is subject to the same policies and procedures with

10   respect to its customer service calls. Of special note is that the customer service

11   agents are provided with scripts when interacting with its customers.

12   **PLAINTIFF VALERIE BRANCA**

13       25.    On or about February 13, 2013, OLS mailed Branca a "Welcome to

14   Ocwen!" letter informing Branca that the mortgage loan on her primary residence

15   located in Sun Valley, California would be transferred from Homeward Residential

16   to OLS for servicing. The mortgage on Branca's Sun Valley, California home was

17   in default at the time OLS acquired it. On February 13, 2013, written

18   correspondence from OLS informed Branca: "Ocwen Loan Servicing, LLC is a

19   debt collector attempting to collect a debt: any information obtained will be used

20   for that purpose." Branca also held title to other properties in Reno, Nevada,

21   Caldwell and Boise, Idaho, whose loans were transferred to OLS for servicing in or

22   around February 2013. Each loan transferred to OLS for servicing was in default at

23   the time of the transfer.

24       26.    Within five days of the February 13, 2013, "welcome" letter from OLS,

25   OLS failed to follow the requirements under 15 U.S.C. § 1692g and send Branca

26   written notice advising Branca of (1) the amount of the debt; (2) the name of the

27   creditor to whom the debt is owed; (3) a statement that unless the consumer, within

28

FIRST AMENDED COMPLAINT
10

1 thirty days after receipt of the notice, disputes the validity of the debt, or any portion
2 thereof, the debt will be assumed to be valid  by the debt collector; (4) a statement
3 that if the consumer notifies the debt collector in writing within the thirty-day period
4 that the debt, or any portion thereof, is disputed, the debt collector will obtain
5 verification of the debt or a copy of a judgment against the consumer and a copy of
6 such verification or judgment will be mailed to the consumer by the debt collector;
7 and (5) a statement that, upon the consumer's written request within the thirty-day
8 period, the debt collector will provide the consumer with the name and address of
9 the original creditor, if different from the current creditor.  15 U.S.C. § 1692g(a)(1)–
10 (5).  OLS was required to send such notice to Branca no later than February 18,
11 2013, but failed to do so in violation of 15 U.S.C. § 1692g.

12     27.     Beginning in or around March 2013, Branca began receiving calls from
13 OLS on her cordless telephone.  Between March 2013 and August 2013, Branca
14 spoke with an agent, employee and/or representative of OLS on her cordless
15 telephone approximately once a month.   During these telephone conversations,
16 OLS would request confidential personal and financial information from Branca.
17 All of the conversations were related to the status of Branca's mortgage loan
18 accounts.  OLS would request information such as portions of Branca's social
19 security number, her home address, addresses of other real properties Branca owned,
20 and loan numbers.  Branca, not knowing that the telephone conversations were
21 being recorded, discussed and divulged confidential and sensitive information to
22 OLS.  If Branca had known that the conversations were being recorded, Branca
23 would not have been so candid and forthcoming during the calls.  At no point during
24 these telephone conversations did OLS advise Branca that the conversation were
25 being monitored and/or recorded.  At no point during these telephone conversations
26 did OLS request from Branca her consent in recording or monitoring the telephone
27 conversations.  At the time, Branca believed that these telephone conversations were
28

1  private as she heard no warning at the commencement of any of the conversations
2  that the telephone calls would be recorded.  Further, Branca did not hear any beeps
3  or other sounds that would inform her that the telephone calls were being recorded.
4  Branca had a reasonable expectation that the calls would be kept private because she
5  was not warned that they were being monitored and/or recorded.  "California
6  consumers are accustomed to being informed at the outset of a telephone call
7  whenever a business entity intends to record the call, it appears equally plausible
8  that, in the absence of such an advisement, a California consumer reasonably would
9  anticipate that such a telephone call is not being recorded, particularly in view of the
10  strong privacy interest most persons have with regard to the personal financial
11  information frequently disclosed in such calls."  Kearny v. Salomon Smith Barney,
12  Inc., 39 Cal. 4th 95, 118, fn. 10 (2006).
13      28.    In August of 2013, Branca initiated approximately two calls to OLS
14  and spoke with an OLS representative named "Jeff."  During the first conversation,
15  Branca spoke with Jeff on a cordless telephone and Jeff did not advise that the
16  telephone call was being monitored and/or recorded.  Jeff did not request Branca's
17  consent to have the call monitored and/or recorded.  Again, confidential and
18  personal information was exchanged to confirm Branca's identity, such as address, a
19  portion of her SSN, and loan numbers.  During the second conversation, Branca
20  spoke with Jeff on her cellular phone.  At the beginning of the telephone
21  conversation, Jeff made no warning that the call would be monitored and/or
22  recorded.  As with previous calls, confidential and personal information was
23  exchanged to confirm Branca identity, such as address, a portion of her SSN, and a
24  loan number.  Finally, during the second call with Jeff, Branca asked whether the
25  call was being recorded.  Jeff admitted that their current call was being recorded and
26  that previous calls had been recorded.  Believing that her calls with OLS had been
27  confidential and private all along, Branca asked why the calls were being recorded.
28

1  Jeff responded by advising that they were regularly recorded as part of
2  "governmental regulations" and that OLS was required to follow specific guidelines.
3  Even during this second conversation in August of 2013, Jeff failed to request
4  Branca's consent to record the call.

5      29.    In September 2013, Branca had approximately two conversations with
6  OLS on her cordless telephone.  During these conversations, OLS again failed to
7  inform Branca that the calls were being recorded and failed to request Branca's
8  consent to record the calls.  Confidential and sensitive information was exchanged
9  during these calls such as a portion of Branca's social security number, address, and
10 loan information.  During these calls, Branca requested who the actual lender of her
11 property was since OLS was the servicer, but did not "own" the loan.  OLS refused
12 to provide any lender information during the telephone conversations and advised
13 that it would email Branca the name of the lender in the next couple of days.  OLS
14 never emailed Branca the name of the lender.

15     30.    Until recently, Branca was unaware that her conversations were being
16 recorded and, therefore, Branca could not and indeed did not consent to the
17 recordation and/or monitoring of such conversations.  Furthermore, Branca was not
18 given an opportunity to decline engaging in these telephone conversations, or limit
19 the confidential content of these telephone conversations, because she lacked
20 knowledge that such conversations were being recorded.

21 **PLAINTIFF LISA DIFFINE**

22     31.    On or about February 22, 2013, OLS mailed Diffine a "Welcome to
23 Ocwen!" letter, which provided that the mortgage loan on Diffine's primary
24 residence located in Chino Hills, California would be transferred from Homeward
25 Residential to OLS for servicing.  The mortgage on Diffine's home was in default at
26 the time OLS acquired it.  On the February 22, 2013, written correspondence, OLS
27
28

1  informed Diffine: "Ocwen Loan Servicing, LLC is a debt collector attempting to
2  collect a debt: any information obtained will be used for that purpose."

3      32.    Within five days of the February 22, 2013, "welcome" letter from OLS,
4  OLS failed to follow the requirements under 15 U.S.C. § 1692g  and send Diffine
5  written notice advising Diffine of (1) the amount of the debt; (2) the name of the
6  creditor to whom the debt is owed; (3) a statement that unless the consumer, within
7  thirty days after receipt of the notice, disputes the validity of the debt, or any portion
8  thereof, the debt will be assumed to be valid  by the debt collector; (4) a statement
9  that if the consumer notifies the debt collector in writing within the thirty-day period
10 that the debt, or any portion thereof, is disputed, the debt collector will obtain
11 verification of the debt or a copy of a judgment against the consumer and a copy of
12 such verification or judgment will be mailed to the consumer by the debt collector;
13 and (5) a statement that, upon the consumer's written request within the thirty-day
14 period, the debt collector will provide the consumer with the name and address of
15 the original creditor, if different from the current creditor.  15 U.S.C. § 1692g(a)(1)–
16 (5).  OLS was required to send such notice to Diffine no later than February 27,
17 2013, but failed to do so in violation of 15 U.S.C. § 1692g.

18     33.    Between in or around March 2013 and in or around October 2013,
19 Diffine initiated approximately 50 calls to OLS on her cordless home telephone or
20 her cellular phone.  During these telephone conversations, OLS would request
21 confidential personal and financial information from Diffine.  All of the
22 conversations were related to the status of Diffine's mortgage loan account.  OLS
23 would request information such as the last four digits of Diffine's social security
24 number, her full home address, her date of birth, and property identification
25 numbers.  In one conversation during this time period, OLS even requested
26 information with respect to Diffine's parents and her parents' banking information.
27 If Diffine had known the calls were being recorded, Diffine would not have been as
28

FIRST AMENDED COMPLAINT
14

1 forthcoming with respect to the private, confidential, and personal information she
2 was providing to OLS.  OLS never advised Diffine at the outset of the calls that
3 their conversations were being monitored and/or recorded.  OLS never requested
4 Diffine's consent to record or monitor the calls.

5      34.    In a about a quarter of the conversations between OLS and Diffine,
6 Diffine asked whether the calls were being recorded.  The responses that Diffine
7 received after asking if a call was being recorded were: "yes," "I don't know,"
8 "some calls are recorded," and on two separate occasions, "we don't have to tell you
9 because it's only used for quality assurance."  Diffine never received a consistent
10 response as to whether the calls were actually being recorded.  Accordingly, Diffine
11 had no way to determine whether each of the calls was, in fact, being recorded.
12 Diffine had a reasonable expectation that the calls would be kept private unless
13 warned that they were being monitored and/or recorded.  "California consumers are
14 accustomed to being informed at the outset of a telephone call whenever a business
15 entity intends to record the call, it appears equally plausible that, in the absence of
16 such an advisement, a California consumer reasonably would anticipate that such a
17 telephone call is not being recorded, particularly in view of the strong privacy
18 interest most persons have with regard to the personal financial information
19 frequently disclosed in such calls."  Kearny v. Salomon Smith Barney, Inc., 39 Cal.
20 4th 95, 118, fn. 10 (2006).

21      35.    Until recently, Diffine was unaware that her conversations were being
22 recorded and, therefore, Diffine could not and, indeed, did not consent to the
23 recordation and/or monitoring of each one of her conversations with OLS.
24 Furthermore, Diffine was not given an opportunity to decline engaging in the
25 telephone conversations, or limit the confidential content of these telephone
26 conversations, because she lacked knowledge that such conversations were being
27 recorded.

28

36.     At all times relevant herein, Plaintiffs did not know if telephone conversations were with representatives, agents and/or employees of OLS, or whether their conversations were with representatives, agents and/or employees of OMS and/or OFC.  The customer service representatives would merely advise that Plaintiffs were calling Ocwen.  Accordingly, all of the above allegations are also alleged against OMS and OFC.

37.     Plaintiffs are informed and believe, and thereon allege that, at all relevant times to this action, the Ocwen Companies operate a number of call centers that received calls from and/or dialed out to consumers nationwide, including within the State of California.

38.     Plaintiffs are informed and believe, and thereon allege that, at all relevant times to this action, the Ocwen Companies implemented and maintained a policy and practice of recording and/or intercepting all telephone conversations with California consumers via recording and intercepting technology.

39.     Plaintiffs are informed and believe, and thereon allege that, at all relevant times to this action, the Ocwen Companies did indeed intentionally and surreptitiously use electronic technology to record and/or monitor all telephone conversations with California consumers.

40.     Plaintiffs are informed and believe, and thereon allege that, at all relevant times to this action, the Ocwen Companies maintained a policy and practice of not providing consumers with knowledge that the Ocwen Companies were recording and/or monitoring their telephone conversations, unless Ocwen agents, employees, and/or representatives were asked whether such conversations were recorded and/or monitored.

41.     Plaintiffs are informed and believe, and thereon allege that, at all relevant times to this action, the Ocwen Companies did not obtain consent from

California consumers prior to recording and/or monitoring such telephone conversations.

42.     Plaintiffs are informed and believe, and thereon allege that, at all times relevant to this action, the Ocwen Companies intentionally and surreptitiously stored, maintained, aggregated, and accessed electronic recordings of Defendants' conversations with California consumers, in which confidential personal and financial information was discussed or divulged as all conversations pertained to loan account information and verification of a person's identity and address were necessary.

## CLASS-ACTION ALLEGATIONS

43.     Plaintiffs seek to represent three Classes, defined as follows:

a. **Recording/Monitoring Class**:  All California residents who, during the relevant statutory period, participated in one or more inbound and/or outbound, recorded and/or monitored telephone conversations with employees, agents, or representatives of Defendants without Defendants' providing a warning at the outset of the calls that the calls were being recorded and/or monitored.

b. **Cordless/Cellular Class**:  All California residents who, during the relevant statutory period, participated in one or more inbound and/or outbound, recorded and/or monitored telephone conversations on a cordless and/or cellular phone with employees, agents, or representatives of Defendants without Defendants' providing a warning at the outset of the calls that the calls were being recorded and/or monitored.

c. **1692g Class**:  All persons throughout the United States who, during the relevant statutory period, had the servicing of their loans transferred to Defendants but did not receive written notice from

1        Defendants of all of the items enumerated in 15 U.S.C. § 1692g

2            within five days of Defendants' initial communication with the

3            person ("1692g Class").

4    44.    Plaintiffs reserve the right to amend or modify the proposed Classes

5 described hereinabove with greater specificity, or propose further subclasses or

6 limitations to particular issues, in response to facts later ascertained.

7    45.    This action may properly be maintained as a class action pursuant to

8 Rule 23 of the Federal Rules of Civil Procedure.

9    **A. Numerosity**

10    46.    Joinder of the class would be impracticable due to sizeable number of

11 members and the Class members' lack of resources to initiate individual claims.

12 Plaintiffs estimate that the size of the Class consists of at least 10,000 persons.

13 Given the small amount of recovery and the lack of resources to pursue individual

14 claims, it is impractical to join each Class member as a named plaintiff.   Plaintiffs

15 are informed and believe that the identities and addresses of Class Members may be

16 ascertained from Defendants' own business and loan records and recordings, as well

17 as the records and recordings of Defendants' telephone providers.

18    **B. Community of Interest; Common Questions of Law & Fact**

19    47.    There are questions of law and fact that are common to the members of

20 the Classes that predominate over any questions affecting only individual Class

21 Members.   These common questions include, without limitation:

22        (a) Whether Defendants had a policy and practice of monitoring and/or

23            recording all inbound and/or outbound telephone conversations with

24            consumers;

25        (b) Whether Defendants installed call recording technology to implement their

26            policies of intentionally recording and/or intercepting telephone

27            conversations with consumers;

28

(c) Whether Defendants trained, directed, or instructed its employees, agents, or representatives to record all of Defendants' inbound and outbound calls with consumers;

(d) Whether Defendants recorded and/or monitored all inbound and/or outbound telephone conversations with consumers;

(e) Whether Defendants had a policy and practice of not informing consumers at the outset of the inbound and/or outbound calls that the conversations were being monitored and/or recorded;

(f) Whether Defendants had a policy and practice of training, instructing, or directing its employees of not informing consumers at the outset of the inbound and/or outbound calls that the conversations were being monitored and/or recorded;

(g) Whether Defendants failed to warn Class Members that the inbound and/or outbound calls were being monitored and/or recorded;

(h) Whether Defendants' failure to warn Class Members that the calls were being monitored and/or recorded constitutes a violation of California Penal Code section 632;

(i) Whether Defendants' failure to obtain the consent to record and/or monitor the telephone conversations between Class Members and Defendants' agents, employees, and/or representatives constitutes a violation of California Penal Code section 632;

(j) Whether Defendants' failure to warn Class Members that the calls in which the consumer was using a cellular phone or cordless phone were being monitored and/or recorded constitutes a violation of California Penal Code section 632;

(k) Whether Defendants' failure to obtain the consent to record and/or monitor the telephone conversations between Class Members using a cellular

1  phone or cordless phone and Defendants' agents, employees, and/or

2  representatives constitutes a violation of California Penal Code section

3  632.7;

4  (l) Whether Class Members are entitled to statutory damages of $5,000 under

5  California Penal Code section 637.2 for every violation of California Penal

6  Code sections 632 and/or 632.7;

7  (m)  Whether Class Members are entitled to injunctive relief under

8  California Penal code section 637.2(b) to enjoin or restrain Defendants

9  from committing further violations of California Penal Code sections 632

10  and/or 632.7;

11  (n) Whether Defendants are "debt collectors" under 15 U.S.C. §1692a;

12  (o) Whether Defendants' policies and practices of failing to inform Class

13  Members that their calls were being monitored and/or recorded constitutes

14  a false, deceptive, or misleading representation under 15 U.S.C. § 1692e;

15  (p) Whether Defendants' policies and practices of failing to inform Class

16  Members that their calls were being monitored and/or recorded entitles

17  Class Members to damages of at $1,000 each under 15 U.S.C. § 1692k;

18  and

19  (q) Whether Defendants had a policy and practice of failing to provide Class

20  Members with the information required under 15 U.S.C. § 1692g(a) within

21  5 business days of its initial communication in connection with the

22  collection of any debt.

23  **C. Typicality of Claims**

24  48.    The claims of the named Plaintiffs are typical of the claims of the

25  members of the proposed Classes.  Plaintiffs' claims and Class Members' claims

26  arise out of the same course of conduct of Defendants.

27  **D. Adequacy of Representation**

28

FIRST AMENDED COMPLAINT
20

49.     The named Plaintiffs will fairly and adequately represent and protect the interests of the Class Members.  Plaintiffs do not have any conflicts with the other Class Members and plan on pursuing the litigation vigorously.  Plaintiffs have the same common interests as those of the members of the Class and have retained well-qualified attorneys to represent them and the Class.  Plaintiffs have been involved in the litigation and understand the fiduciary duties that they hold to all Class Members.  Plaintiffs will continue to participate and be available for the duration of the litigation.  Plaintiffs' Counsel are competent and experienced in litigating class actions and will devote adequate staff and resources to represent the interests of the Classes.

**E. Superiority of Class Action**

50.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Individual joinder of all Class Members is impracticable because of the smaller recovery amounts in addition to the lack of resources available for the individual Class Members to pursue separate actions.  The judicial system would be burdened with multiple trials of the same issues and the potential for inconsistent or contradictory judgments would increase.  The common questions of law and fact predominate in this action as the Plaintiffs' and the Class Members' claims arise out of the same course of conduct of Defendants.  A class action would conserve the resources of the parties and the court while protecting the rights of the members of the class.

51.     Defendants' conduct as described above is unlawful, continuing, capable of repetition, and will continue unless restrained and enjoined by the Court.  It would be a matter of public interest to obtain definitive answers to the legality of Defendants' actions in this case.

52.     In addition to asserting class-action claims, pursuant to California Business and Professions Code section 17200 *et seq.*, Plaintiffs assert a claim on

1  behalf of the general public.  Plaintiffs seek to enjoin Defendants from engaging in

2  the unfair, unlawful, and/or deceptive business practices alleged in this Complaint.

3  A representative action is necessary and appropriate because Defendants have

4  engaged in the wrongful acts described herein as a general business practice.

5  Therefore, utilization of a class action is the most economically feasible means of

6  determining the merits of this litigation.

7
8
9
10
11

**FIRST CLAIM FOR RELIEF**
**UNLAWFUL INTERCEPTION OR RECEPTION AND**
**INTENTIONAL RECORDING OF COMMUNICATIONS**
**(CALIFORNIA PENAL CODE § 632.7)**
**(On Behalf of Plaintiffs and the Cordless/Cellular Class**
**Against All Defendants)**

12      53.     The preceding paragraphs of this First Amended Complaint are re-

13  alleged and incorporated herein by reference.

14      54.     The Legislature of the State of California enacted CIPA and provided

15  new statutory safeguards and remedies in order to protect private communications

16  and the right of privacy in an environment of expanding technology.  California

17  Penal Code section 630 provides, in relevant part:

18          The Legislature hereby declares that advances in science and

19      technology have led to the development of new devices and

20      techniques for the purpose of eavesdropping upon private

21      communications and that the invasion of privacy resulting from

22      the continual and increasing use of such devices and techniques

23      has created a serious threat to the free exercise of personal

24      liberties and cannot be tolerated in a free and civilized society.

25      The Legislature by this chapter intends to protect the right of

26      privacy of the people of this state.

27  Cal. Pen. Code § 630.

28

FIRST AMENDED COMPLAINT
22

55.   California Penal Code section 632.7 specifically prohibits the interception or reception and intentional recordation of a communication transmitted between two telephones, where one telephone is a cellular radio or cordless telephone, without the consent of all parties.

56.   Defendants' policy and practice of intentionally recording all telephone communications occurring between Defendants' agents, employees and/or representatives and Plaintiffs and Class Members, without their knowledge and/or consent, violates California Penal Code section 632.7 where such communication occurred involving a cordless telephone and/or cellular radio telephone.  As alleged hereinabove, Plaintiffs' calls with Defendants were by cordless telephone or cellular telephone.

57.   Pursuant to California Penal Code section 637.2, Plaintiff and Class members are entitled to the greater of $5,000 or treble damages for each violation of California Penal Code section 632.7, and are entitled to injunctive relief, whether or not Plaintiffs and Class Members suffered or were threatened with actual damages.

**SECOND CLAIM FOR RELIEF**
**UNLAWFUL EAVESDROPPING AND/OR**
**RECORDING OF CONFIDENTIAL COMMUNICATION**
**(CALIFORNIA PENAL CODE § 632)**
**(On Behalf of Plaintiffs and the Recording/Monitoring Class**
**Against All Defendants)**

58.   The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

59.   California Penal Code section 632 specifically prohibits the eavesdropping upon or recording of confidential telephone communications by means of any electronic recording device without the consent of all parties.

60.   Defendants' policy and practice of intentionally recording all telephone communications occurring between Defendants' agents, employees and/or representatives and Plaintiffs and Class members, without their knowledge and/or

1 consent, violates California Penal Code section 632 because such communications
2 were confidential.

3     61.    A communication is confidential, for purposes of the Privacy Act
4 section prohibiting recording of confidential communications, where a party to the
5 conversation has an objectively reasonable expectation that the conversation is not
6 being overheard or recorded. <u>Lieberman v. KCOP Television, Inc.</u>, 110 Cal. App.
7 4th 156, 167–68 (2003).

8     62.    Under subsection (c) of California Penal Code section 632, the
9 respective communications with Diffine and Branca, as described in more detail in
10 the paragraphs hereinabove, were "confidential" communications.

11     63.    Defendants' policy and practice of not informing Plaintiffs and Class
12 Members that their calls were being recorded, and not seeking consent to such
13 recording, created an objectively reasonable expectation that Plaintiffs' and Class
14 members' communications were not being recorded.

15     64.    Pursuant to California Penal Code section 637.2, Plaintiff and Class
16 members are entitled to the greater of $5,000 or treble damages for each violation of
17 California Penal Code section 632, and are entitled to injunctive relief, whether or
18 not Plaintiff and Class members suffered or were threatened with actual damages.

19

**THIRD CLAIM FOR RELIEF**
20 **VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT**
**FOR FALSE, DECEPTIVE, OR MISLEADING PRACTICES**
21 **(15 U.S.C. §§ 1692e and 1692k)**
22 **(On Behalf of Plaintiffs and the Recording/Monitoring Class and**
**Cordless/Cellular Class Against All Defendants)**
23

24     65.    The preceding paragraphs of this First Amended Complaint are re-
25 alleged and incorporated by reference.

26     66.    Defendants OLS, OMS, and OFC are "debt collectors" under the
27 FDCPA, which means "any person who uses any instrumentality of interstate
28 commerce or the mails in any business the principal purpose of which is the

1  collection of any debts, or who regularly collects or attempts to collect, directly or

2  indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. §

3  1692a(6).

4      67.    Pursuant to the FDCPA, a debt collector may not use any false,

5  deceptive, or misleading representation or means in connection with the collection

6  of any debt, which includes, inter alia, "the use of any false representation or

7  deceptive means to collect or attempt to collect any debt or to obtain information

8  concerning a consumer." 15 U.S.C. §1692e(10). Plaintiffs allege that by

9  surreptitiously monitoring and/or recording telephone conversations with them,

10  Defendants have violated the FDCPA.

11      68.    Pursuant to 15 U.S.C. § 1692k, Plaintiffs and Class Members are

12  entitled to statutory damages of not more than $1,000 per person, attorneys' fees and

13  costs of suit.

14

15  ### FOURTH CLAIM FOR RELIEF
    **VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT**

16  **FOR FAILING TO PROVIDE WRITTEN NOTICE**
    **(15 U.S.C. §§ 1692g and 1692k)**

17  **(On Behalf of Plaintiffs and the 1692g Class Against All Defendants)**

18      69.    The preceding paragraphs of this First Amended Complaint are re-

19  alleged and incorporated by reference.

20      70.    15 U.S.C. § 1692e provides, in relevant part:

21      Within five days after the initial communication with a consumer in

22      connection with the collection of any debt, a debt collector shall,

23      unless the following information is contained in the initial

24      communication or the consumer has paid the debt, send the consumer

25      a written notice containing—

26          (1) the amount of the debt;

27          (2) the name of the creditor to whom the debt is owed;

28

FIRST AMENDED COMPLAINT
25

1    (3) a statement that unless the consumer, within thirty days after

2    receipt of the notice, disputes the validity of the debt, or any

3    portion thereof, the debt will be assumed to be valid by the debt

4    collector;

5    (4) a statement that if the consumer notifies the debt collector in

6    writing within the thirty-day period that the debt, or any portion

7    thereof, is disputed, the debt collector will obtain verification of

8    the debt or a copy of a judgment against the consumer and a

9    copy of such verification or judgment will be mailed to the

10    consumer by the debt collector; and

11    (5) a statement that, upon the consumer's written request within

12    the thirty-day period, the debt collector will provide the

13    consumer with the name and address of the original creditor, if

14    different from the current creditor.

15    15 U.S.C.A. § 1692g.  Plaintiffs allege that by failing to provide written notice of

16    the above-required items within 5 days of the initial communication by Defendants,

17    Defendants have violated Section 1692g.  On information and belief, Class

18    Members likewise did not receive proper written notices pursuant to Section 1692g

19    within 5 days of the initial communication by Defendants.

20    71.    Pursuant to 15 U.S.C. § 1692k, Plaintiffs and Class Members are

21    entitled to statutory damages of not more than $1,000 per person, attorneys' fees and

22    costs of suit.

23
**FIFTH CLAIM FOR RELIEF**
24
**UNFAIR BUSINESS PRACTICES**
25
**(BUSINESS & PROFESSIONS CODE §§ 17200 *et seq.*)**
**(On Behalf of Plaintiffs and the Classes Against All Defendants)**
26
72.    The preceding paragraphs of this First Amended Complaint are re-
27
alleged and incorporated by reference.
28

FIRST AMENDED COMPLAINT
26

73.     Plaintiffs, on behalf of themselves and others similarly situated, bring this claim pursuant to Business & Professions Code sections 17200 *et seq*. The conduct of Defendants, as alleged in this Complaint, has been and continues to be unfair, unlawful, and harmful to the Plaintiffs and the general public.  Plaintiffs seek to enforce important rights affecting the public pursuant to Code of Civil Procedure section 1021.5.

74.     Plaintiffs are "persons" within the meaning of Business and Professions Code section 17204, have suffered injury, and therefore have standing to bring this action for injunctive relief, restitution, relief under section 17202, and other equitable relief.

75.     CIPA expresses fundamental and important public policies of this state in protecting the right of privacy of the people of the State of California.

76.     The FDCPA was enacted recognizing that: "There is abundant evidence of the use of abuse, deceptive, and unfair debt collection practices by many debt collectors.  Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy."  15 U.S.C. §1692(a).

77.     Throughout the relevant liability period as alleged herein, through Defendants' conduct, Defendants have violated the right of privacy of the people of the State of California and Defendants have used deceptive and unfair means in attempting to collect debts from consumers.  Such conduct constitute unlawful and unfair business practices in violation of Business and Professions Code sections 17200 *et seq.*, which have deprived Plaintiffs and Class Members of the rights, benefits and privileges guaranteed under the law.  By and through the unfair and unlawful business practices described herein, Defendants have deprived Plaintiffs and Class Members of rights and benefits guaranteed to Plaintiffs by

1  law.  Defendants have derived numerous benefits from these unlawful practices and
2  are able to unfairly compete against competitors who comply with the law.

3    78. Defendants have engaged in unlawful business acts and practices by
4  violating California law, including but not limited to California Penal Code sections
5  632, 632.7, and 637.2 and the FDCPA, 15 U.S.C. §§ 1692e and 1692g.

6    79. As a result of Defendants' violations of the Unfair Competition
7  Law, Defendants have unjustly enriched themselves at the expense of Plaintiffs,
8  Class Members, and the general public.

9    80. Plaintiffs request that the Court enter such orders or judgments as may
10  be necessary to enjoin Defendants from engaging in further unfair competition as
11  provided in California Business and Professions Code section 17203.  Plaintiffs
12  have standing under California Business and Professions Code section 17204 to
13  bring a claim as they are persons bringing a complaint and they are persons
14  who have suffered injury in fact and/or have lost money or property as a result
15  of Defendants' unfair business practices and policies.

16    81. Plaintiffs' efforts in securing the requested relief will result "in the
17  enforcement of an important right affecting the public interest," as "a significant
18  benefit, whether pecuniary or nonpecuniary, [will] be[] conferred on . . . a large
19  class of persons."  Cal. Civ. Proc. Code § 1021.5.  Moreover, because "the necessity
20  and financial burden of private enforcement . . . are such as to make [an attorney's
21  fee] award appropriate, and [because attorney's] fees should not in the interest of
22  justice be paid out of the recovery, if any," id., Plaintiffs request that the Court also
23  award reasonable attorney's fees pursuant to the provisions of section 1021.5 of the
24  California Code of Civil Procedure.

25    82. Plaintiffs and Class Members have no plain, speedy, or adequate
26  remedy at law, inasmuch as Defendants, unless enjoined by an order of this Court,
27  will continue to violate systematically the provisions of sections of the California
28

FIRST AMENDED COMPLAINT<br>28

Penal Code and the FDCPA, as set forth in this Complaint.

83.   Pursuant to section 17205, the remedies and penalties provided by section 17200 *et seq.* are cumulative to the remedies and penalties available under all other laws of this state.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1. That the Court certify the Classes.

2. That, with respect to the First Claim for Relief, this Court enter judgment in favor of Plaintiffs and the proposed members of the Cordless/Cellular Class and against Defendants for their unlawful interception or reception and intentional recordings of communications under California Penal Code section 632.7. Pursuant to California Penal Code section 637.2, Plaintiff and Class members are entitled to the greater of $5,000 or treble damages for each violation of California Penal Code section 632.7, and are entitled to injunctive relief, whether or not Plaintiffs and Class Members suffered or were threatened with actual damages.

3. That, with respect to the Second Claim for Relief, this Court enter judgment in favor of Plaintiffs and the proposed members of the Recording/Monitoring Class and against Defendants for the unlawful eavesdropping and/or recording of confidential communications under California Penal Code section 632. Pursuant to California Penal Code section 637.2, Plaintiff and Class members are entitled to the greater of $5,000 or treble damages for each violation of California Penal Code section 632, and are entitled to injunctive relief, whether or not Plaintiff and Class members suffered or were threatened with actual damages.

4. That, with respect to the Third Claim for Relief, this Court enter judgment in favor of Plaintiffs and the proposed members of the Cordless/Cellular and

1  Recording/Monitoring Classes and against Defendants for false, deceptive, or
2  misleading practices under the FDCPA, 15 U.S.C. § 1692e.   Pursuant to 15
3  U.S.C. § 1692k, Plaintiffs and Class Members are entitled to statutory
4  damages of not more than $1,000 per person, attorneys' fees and costs of suit.
5  5. That, with respect to the Fourth Claim for Relief, this Court enter judgment in
6     favor of Plaintiffs and the proposed members of all the Classes and against
7     Defendants for violations of the FDCPA, 15 U.S.C. § 1692g.   Pursuant to 15
8     U.S.C. § 1692k, Plaintiffs and Class Members are entitled to statutory
9     damages of not more than $1,000 per person, attorneys' fees and costs of suit.
10  6. That, with respect to the Fifth Claim for Relief, this Court enter judgment in
11     favor of Plaintiffs and the Classes, and that it be adjudged that Defendants
12     violated the relevant provisions of CIPA and the FDCPA.  Accordingly,
13     Plaintiffs request that the Court enjoin Defendants from further violations of
14     CIPA and the FDCPA, reasonable attorneys' fees, and costs of suit incurred
15     in the prosecution of the Fifth Claim for Relief pursuant to section 1021.5 of
16     the California Code of Civil Procedure.
17  7. For such other and further relief as this Court may deem fit and proper.
18
19  DATED:     October 18, 2013              JAURIGUE LAW GROUP:
20
21                                      _____ /s/ Abigail Treanor _____
22                                      Michael J. Jaurigue
23                                      Abigail A. Treanor
24                                      Attorney for Plaintiffs
25
26
27
28
                        FIRST AMENDED COMPLAINT
                                  30

## PROOF OF SERVICE

I am employed in the County of Los Angeles; I am over the age of eighteen years and not a party to the within entitled action; my business address is 114 N. Brand Blvd., Suite 200, Glendale, CA 91203.

On **October 18, 2013** I served the following document(s) described **FIRST AMENDED COMPLAINT** on the interested party(ies) in this action by placing true copies thereof addressed as follows:

> Richard E. Gottlieb
> Fredrick S. Levin
> Buckley Sandler LLP
> 100 Wilshire Boulevard, Suite 1000
> Santa Monica, CA 90401
> rgottlieb@buckleysandler.com
> flevin@buckleysandler.com

X   **BY EMAIL**: I caused the document described above to be emailed to the recipients set forth above.

☐   **U.S. Mail:** I am readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Glendale, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐   **BY HAND DELIVERY:** I caused such envelope(s) to be delivered by hand to the office of the addressee(s).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **October 18, 2013,** at Glendale, California.

_____ /s/ Abigail Treanor _____

# Exhibit 1

AUGUST 17, 2012                                                                 RESIDENTIAL MBS

## Moody's
INVESTORS SERVICE

# SERVICER REPORT

# Ocwen Loan Servicing, LLC

**Table of Contents**

| | |
|---|---|
| SUMMARY OPINION | 1 |
| COMPANY BACKGROUND | 2 |
| SERVICING PORTFOLIO | 2 |
| SERVICING ABILITY | 3 |
| CUSTOMER SERVICE | 4 |
| COLLECTIONS MANAGEMENT | 6 |
| LOSS MITIGATION | 7 |
| FORECLOSURE, BANKRUPTCY AND REO TIMELINE MANAGEMENT | 10 |
| LOAN ADMINISTRATION | 12 |
| SERVICING STABILITY | 13 |
| APPENDIX | 17 |
| MOODY'S RELATED RESEARCH | 18 |

**Analyst Contacts**

Gene Berman
*Assistant Vice President - Analyst*
+1.212.553.4139
gene.berman@moodys.com

William Fricke
*Vice President - Senior Credit Officer*
+1.212.553.4586
william.fricke@moodys.com

**OCWEN CONTACT:**

Ronald M. Faris
*President*
+1.561.682.8560
ronald.faris@ocwen.com

**OCWEN WEBSITE:**

www.ocwen.com

**MOODY'S CLIENT SERVICES:**

New York: +1.212.553.1653
Tokyo: +81.3.5408.4100
London: +44.20.7772.5454
Hong Kong: +852.3551.3077
Sydney: +612.9270.8100
Singapore: +65.6398.8308

**ADDITIONAL CONTACTS:**

Website: www.moodys.com

| Assessments | |
|---|---|
| Primary Servicer of Subprime Loans | SQ2- |
| Special Servicer | SQ2- |
| **Related Ratings** | |
| Ocwen Financial Corporation Senior Unsecured Rating | B2 |
| Ocwen Financial Corporation Corporate Family and Senior Secured Rating | B1 |

Assessment Publication Date: 19 March 2012

## Summary Opinion

On 19 March 2012, we downgraded to **SQ2-** from **SQ2** our service quality (SQ) assessment on Ocwen Loan Servicing, LLC, as a Special Servicer and affirmed the **SQ2-** assessment as a Primary Servicer of subprime residential mortgage loans. Both assessments remain on review for downgrade.

We initiated the review for downgrade 30 June 2011, on concerns related to Ocwen's integration of Litton's servicing platform and sizable portfolio. Since then, Ocwen has completed purchases of mortgage servicing rights (MSRs) from JPMorgan Chase and of assets of Saxon's servicing portfolio. It has also announced an MSR purchase from Bank of America, which will expand Ocwen's portfolio to more than $140 billion in 2012, from around $55 billion in mid-2010. Ocwen's servicing portfolio (excluding REO) contained 789,712 loans with an unpaid principal of approximately $119.8 billion as of 30 June 2012.

Ocwen has tripled the number of its employees in the past two years. As of 31 May 2012, Ocwen had 5,063 employees: 843 in the US, 4,141 in India, and 79 in Uruguay.

The downgrade and the review for downgrade were due to concerns related to the rapid growth of Ocwen's servicing portfolio and the challenges it faces in integrating the acquired servicing platforms and managing the additional distressed loan portfolios. As it continues to scale up its operations, the company may find maintaining servicing quality a challenge, including hiring experienced default and other mortgage servicing personnel. Much of the growth in its servicing operations will be at its captive sites in India and Uruguay, where the majority of the servicing staff is based.

The SQ assessments reflect Ocwen's Above Average collections ability, Strong loss mitigation results, Above Average foreclosure and REO timeline management, and Below Average servicing stability.

Since the last review, the company has merged its customer service and early collections teams into a single group that operates in a blended inbound/outbound call environment. Despite call center spikes during the HomEq acquisition, Ocwen maintained solid inbound call abandonment rates following the boarding of Litton's portfolio. However, the collections group made significantly fewer outbound calls from September to November 2011, the first three months following the integration.

Ocwen's loss mitigation practices, with a high level of modifications and re-modifications as well as extensive use of principal forgiveness, remain among the most proactive of the servicers we rate, although it holds fewer short sales than many of its peers. In May 2011, Ocwen implemented an appointment model through which delinquent borrowers can schedule call sessions with loss mitigation specialists. In September 2011, Ocwen changed the model to incorporate the single point of contact mandated by HAMP (Making Home Affordable Program).

In light of the increased government scrutiny into servicers' foreclosure practices, Ocwen made a number of enhancements to its handling of foreclosure documents, including centralizing the signing of affidavits and hiring additional staff to improve communications with outside counsel and to manage state foreclosure requirements.

Ocwen Financial Corporation, the servicing organization's corporate parent, has a B1 senior secured rating and a B2 senior unsecured rating.

## Company Background

Ocwen is the mortgage loan servicing operation of Ocwen Financial Corporation (Ocwen Financial) and specializes in the servicing of subprime and seriously delinquent mortgage loans. Exhibit 1 shows the group's corporate structure.

EXHIBIT 1
**Ocwen - Corporate Structure**



Source: Ocwen

Ocwen Financial, a publicly traded company (NYSE: OCN), is an asset manager and business process solutions provider with headquarters in Atlanta, Georgia, and offices in West Palm Beach, Florida and Washington, D.C, and support operations in Germany, Uruguay, and India. The company is engaged in a variety of businesses related to residential and commercial mortgage servicing, and focuses on loan servicing, special servicing, and mortgage services.

On 5 March 2012, Home Loan Servicing Solutions, Ltd. (HLSS), a company formed by the chairman of Ocwen Financial, completed its initial public offering. HLSS will facilitate Ocwen's future servicing portfolio growth by providing additional capital and liquidity for loan purchases.

## Servicing Portfolio

Ocwen's servicing portfolio contained 789,712 loans with an unpaid principal balance of around $119.8 billion as of 30 June 2012. Based on the unpaid balance, the portfolio contains subprime loans (54.2%), prime loans (11.4%), Alt-A loans (6.8%), closed-end second lien loans (2.1%), non-performing loans (24.9%), and a small number of HUD and High LTV loans, as Exhibit 2 shows.

MOODY'S INVESTORS SERVICE

RESIDENTIAL MBS

EXHIBIT 2
## Ocwen - Servicing Portfolio ($ millions)
By Product Type



Source: Ocwen

Ocwen's servicing portfolio has grown to nearly $120 billion, from $55 billion in mid-2010, through a number of acquisitions and MSR purchases, as Exhibit 3 shows.

EXHIBIT 3
## Ocwen - Servicing Portfolio Growth

| Acquisition | Transfer Date | Unpaid Principal Balance | Cumulative Unpaid Principal Balance |
|---|---|---|---|
| MSR purchase from Saxon | May 2010 | $6 billion | $45.7 billion |
| HomEq | September 2010 | $22.4 billion | $68.1 billion |
| Purchase of Litton platform from Goldman Sachs | 65% in September 2011and 35% in November 2011 | $38.6 billion | $106.1 billion |
| Asset purchase from Saxon | Boarding completed in April and May 2011 | $22 billion (already subservicing $9.9 billion) | $118.2 billion |
| MSR purchase from JPMorgan Chase | Boarding completed April 2012 | $15 billion | $133.2 billion |
| MSR purchase from Bank of America | In the process of boarding June 2012 | $10.7 billion | $143.9 billion* |

*Actual total will differ due to portfolio run-off.
Source: Ocwen

Ocwen also has been approved by Bank of America as a sub-servicer and will start receiving loans from the bank, beginning with the transfer of 6,300 loans on 1 June 2012.

At the time of this review, Ocwen was also considering the purchase of an additional $300 billion in mortgage servicing rights from various servicers, primarily the divestitures of non-core bank-servicing portfolios.

The servicing portfolio is secured by properties in California (12%), Florida (11%), Texas (9%), New York (5%), and

Illinois (5%), with no other state exceeding a 5% concentration by loan count, as Exhibit 4 shows.

EXHIBIT 4
## Ocwen - Servicing Portfolio
Geographic Distribution by Loan Count



Source: Ocwen

The portfolio is split between loans originated under the fixed-rate fully amortizing program (57%) and the adjustable rate mortgage (ARM) program (27%). The balance of the portfolio is in fixed balloon loans (16%). Exhibit 5 shows a breakdown of Ocwen's servicing portfolio.

EXHIBIT 5
## Ocwen - Servicing Portfolio
By Loan Type as of 30 June 2012



Source: Ocwen

## Servicing Ability

Ocwen's customer service and collections activities take place at servicing sites in Houston, Texas; Bangalore and Mumbai, India; and Montevideo, Uruguay. Loss mitigation teams are located at the West Palm Beach, Florida; Houston, Texas; and Bangalore and Mumbai, India sites.

Ocwen has a higher proportion of staff offshore than other servicers we rate: the majority of its customer service, collections and loss mitigation representatives are offshore.

RESIDENTIAL MBS

Approximately 90% of the collections staff and two thirds of the loss mitigation staff were working out of India or Uruguay at the time of our review.

Since the last review, the company has merged its Customer Relations (customer service) and Early Intervention (collections) units. This effectively combined all of its front office functions. Both inbound and outbound calls for customer service and collections are handled by the new Customer Care group, which falls under the purview of the Residential Loss Mitigation department.

As Exhibit 6 shows, the company now has Loan Servicing and Residential Loss Mitigation conducting its servicing functions.

EXHIBIT 6
### Ocwen - Servicing Structure

| Loan Servicing | Residential Loss Mitigation |
|---|---|
| » Servicing Transaction Mgmt | » Customer Relations |
| » Escrow, Tax, and Insurance | » Early Intervention |
| » Mortgage Insurance | » Home Retention |
| » Cashiering | » Default Servicing |
| » Investor Reporting | » Residential REO |
| » ARMs | |
| » Investor Reconciliation | |
| » Document Control | |
| » Contract Management | |
| » Expense Recovery | |
| » Compliance and Claims | |
| » Consumer Ombudsman | |

In September 2011, Ocwen updated its appointment model to include single-point-of-contact logic for borrowers in all stages of delinquency who seek assistance due to a hardship.

Ocwen has 5,063 servicing employees worldwide; its global turnover was around 30.4% for the 12 months ending 31 May 2012. Its headcount, which was 1,431 on 30 April 2010, has increased significantly in the past two years.

Exhibit 7 shows the average number of loans per full-time equivalent based on delinquencies from July 2011 through May 2012. Despite significant portfolio growth, the company maintains solid staffing ratios.



EXHIBIT 7
**Ocwen - Staffing Ratios**
By Delinquency Stage

FTE = Full-time equivalent
Source: Ocwen

## Customer Service

» Customer service agents now handle calls for all stages of delinquency

» Company merged customer service and collections call centers

» Call center metrics stabilize after spike

### Organizational Structure

Ocwen's customer service group is spread among four locations: Houston, Texas; Bangalore and Mumbai, India; and Montevideo, Uruguay. Customer service agents in Montevideo work with Spanish-speaking borrowers. The company divides its customer service group into three primary areas: customer care, loss mitigation and correspondence.

Research, payoff and skip tracing teams operate within the care group. The care customer group handles inbound calls from borrowers in all stages of delinquency. When a borrower demonstrates a potential or existing hardship, customer care agents schedule an appointment with a loss mitigation specialist to purse possible resolutions. The research team responds to written customer requests for loan documents and payment history. The payoff team processes payoffs and reinstatement quotes. Borrowers also can pursue self-fulfillment options through Ocwen's interactive voice response system (IVR) and borrower website.

Ocwen also maintains an Office of the Consumer Ombudsman, which handles escalated borrower issues and serves as the company's customer advocate. This group also handles any non-borrower inquiries and reports directly to the company president.

Ocwen's customer service operates from 9:00 a.m. to 9:00 p.m. EST Monday through Thursday, 9:00 a.m. to 6:30 p.m. EST Fridays, and 9:00 a.m. to 1:30 p.m. EST Saturdays.

At the time of our review, the customer care unit, which includes customer service and early stage collections, had 1,255 employees, and the research unit, 51 employees; 94% of the customer care staff and 100% of the research staff were offshore.

## Strategies and Technology

Ocwen uses eWorkforce management software in conjunction with a proprietary staffing model to ensure adequate staffing levels for its call centers. It uses skills-based routing to route borrowers to the agents best able to address their inquiries. It also conducts post-call customer surveys of both inbound and outbound customer calls, as well as participating in annual the J. D. Powers customer service survey. The quality assurance team reviews low-score calls and conducts a "root cause" analysis. Surveys are a good means to assess the performance of a customer service unit.

Agents can email or fax frequently requested customer information from their desktops immediately. To ensure the consistency of messages to borrowers, Ocwen makes extensive use of call prepared text, or scripting, in its customer service unit.

## Phone Interface

Ocwen continues to strengthen its self-service options for borrowers through its IVR and website. Through the IVR, borrowers can check the status of their modification requests and view the credit information Ocwen submits to the credit bureaus. Borrowers can also use the IVR or website for self-serve options, including obtaining loan information, requesting a payoff quote, and making a payment until the 59th day of delinquency, for which Ocwen charges a fee. All of the IVR and website functionality is available in both English and Spanish.

Ocwen also notifies borrowers of payment changes and pending payment information. The IVR has special menus for short sales and newly boarded loans. The company also notes the reasons for borrower calls, which it then analyzes to make any necessary changes to its borrower website, IVR, and agents' call scripts.

The automated system advises callers of the applicable fee for each request, which they can pay at the time of the call. The company uses a real-time IVR monitoring tool to manage abandonment rates, average speed of answer, and talk times, and allocates staff as necessary.

## Web Interface

Ocwen's borrower website includes much of the functionality available through the IVR. Borrowers can update their personal information, request a wide range of loan information, upload their financials, make payments, and notify Ocwen that they have made payments. Ocwen does not charge a fee for these requests, except for payments borrowers make through the website.

Since the last review, the company has added yet more functionality to the website to allow borrowers to obtain updates on the status of their modification requests. The company also notifies borrowers as soon as they log in to the website that a payment is due.

The website also offers a Mortgage Keeper tool to connect borrowers with local services, charities, and programs that can help those suffering difficulties that may prevent them from making regular mortgage payments.

## Performance Management

An independent group monitors six to nine customer service and collections calls per agent per month; the company records and stores all of its inbound and outbound calls for one year. Customer relations team leaders monitor an additional five calls per agent per month.

Ocwen tracks agent performance through regular production and compliance reviews, monthly agent reviews, and work audits.

The customer service, payoff and fulfillment groups participate in the company's incentive program. A Winner's Circle program provides additional incentives to the top 20% of performers on the customer service team, and a quarterly rewards and recognition program recognizes top performers for achieving their goals.

New hires in the customer care group receive four weeks of classroom training and three weeks of additional on-the-job training. The curriculum includes mortgage basics, systems, customer service, loss mitigation and accent neutralization, when applicable. Additionally, both customer service agents and collectors receive training in taking down borrowers' financial information which Ocwen uses to determine the appropriate loss mitigation alternative. Agents receive functional cross-training as well as ongoing supplemental training.

## Customer Service Metrics

As Exhibit 8 shows, the customer service group's abandonment rate was .8% and its average speed of answer,

MOODY'S INVESTORS SERVICE

RESIDENTIAL MBS

14seconds. The customer service call center metrics were solid in first-half 2012, despite the boarding of several large portfolios during the period.

EXHIBIT 8
## Ocwen Customer Service - Call Center Performance



Source: Ocwen

## Collections Management

» Proactive in offering modifications to early stage delinquencies

» Improvement in roll rate performance

» Decline in outbound calls because of increase in inbound calls

We assess Ocwen's collections ability as Above Average.

### Organizational Structure

Ocwen's collectors work out of four locations: Houston, Texas, Bangalore and Mumbai, India, and Montevideo, Uruguay, which handles calls with Spanish-speaking borrowers. Around 90% of Ocwen's collections staff is offshore.

Customer care agents manage accounts in all stages of delinquency, and operate in a blended inbound/outbound environment. The company transfers agents between the inbound and outbound queues based on call volumes. The agents conduct call campaigns, handle written correspondence with borrowers, order door-knocks to verify a property's occupancy, and carry out skip-tracing to locate a borrower; they are also responsible for self-fulfillment payment options via the IVR and the website.

The collections group works with the "consumer psychology department," which focuses on influencing borrower behavior using customized scripting, IVR prompts, written correspondence, and website content.

Ocwen's collections department operates continuously from 3:00 p.m. EST Sunday through 7:00 p.m. EST Fridays, and from 9:00 a.m. to 4:00 p.m. EST Saturdays.

### Collections Strategies and Technology

The company's collections division has an excellent technology infrastructure and solid procedures, including interactive scripting, postal planet codes, best-time-to-call software and weekend hours.

Ocwen prioritizes call campaigns based on a number of factors including a proprietary early-delinquency indicator algorithm that incorporates logic such as "average days paid" to determine when to commence outbound calling. Ocwen also uses "best-time-to-call" logic which incorporates past borrower behavior to determine optimal contact times. Agents make daily attempts to contact borrowers on all loans after the 20th day of delinquency. The company also sends letters on the 5th, 20th, and 50th days of delinquency.

Because ARM loans make up a significant portion (29%) of the servicing portfolio, for these loans Ocwen sends letters 180 and 90 days and makes outbound calls 60 days prior to reset, to advise the borrower of an upcoming rate change.

Ocwen uses optimizer software to determine the best time of day to call delinquent borrowers based on previous contact history.

The company continues to actively offer modifications to borrowers in the early stages of delinquency, which it favors over repayment plans, which it has eliminated from its options. Customer care agents assess whether a borrower is experiencing a hardship and will schedule an appointment with the assigned loss mitigation agent if needed.

Ocwen uses postal planet code technology to remove from its calling queues the names of borrowers who have already mailed in their payments, which minimizes unnecessary contact and increases the efficiency of calling campaigns. The collections unit also manages a Spanish-language mailing program. With automatic number identification, the system captures and stores phone numbers from inbound calls, which it then uses for outbound call campaigns.

Ocwen uses door knocks on the 66th day of delinquency as part of its inspection of properties for which it has been unable to contact the borrower. If a loan remains delinquent without borrower contact, follow-up door knocks will take place every 60 days.

A dedicated unit manages Ocwen's skip-tracing efforts by both internal searches and third-party vendors, to locate borrowers.

## Performance Management

An independent group monitors at least six calls per collector per month, while group leaders, who meet regularly with staff to discuss areas for improvement, monitor an additional number of calls. The company's monthly incentive compensation plan based on call monitoring scores, resolutions and call effectiveness

Ocwen promotes many of its loss mitigation agents from within other parts of the company. These agents receive an additional three weeks of classroom training and one week o-the-job training. All agents participate in FDCPA training, for which they re-test semi-annually.

## Collections Metrics

Among the metrics we use to evaluate a servicer's collections ability are roll rate analyses for different time periods. Exhibit 9 shows the results of one such analysis for loans that had two to five years' seasoning at the beginning of a 12-month period, dividing the loans into three delinquency categories: current to 29 days delinquent, 30 days delinquent, and 60 days delinquent. We then re-measured the status of the loans at the end of the static pool period.

Ocwen's roll rate performance is consistent with an Above Average assessment; performance in all delinquency buckets has improved since the last review, as Exhibit 9 shows. The company is more active than many of its peers in pursuing loss mitigation solutions in the early stages of delinquency. These metrics remain consistent with an Above Average collections assessment.

EXHIBIT 9

### Ocwen Collections - Static Pool Performance
30 June 2010 - 30 June 2011

| Status on Start Date | Current | 30 days | | 60 days | |
|---|---|---|---|---|---|
| Status on End Date | Worse | Better | Worse | Better | Worse |
| Subprime | 17% | 27% | 25% | 20% | 24% |

Source: Ocwen loan-level data

Our analysis of a servicer's collections performance takes into account both the static pool analysis and the performance of the call center. Exhibits 10 & 11 show call center performance for July 2011 to June 2012.

EXHIBIT 10

### Ocwen Collections - Call Center Performance for Loans



Source: Ocwen

During the review period, the collections unit had an average call abandonment rate of .7% and average speed of answer of 10 seconds, both solid results.

Exhibit 11 shows outbound activity for the collections department from July 2011 to June 2012. During that period, outbound calls increased significantly after decreasing throughout 2011 which the company attributed to an increase in the number of inbound calls associated with several large loan boardings.

EXHIBIT 11

### Ocwen Mortgage Collections Outbound Collections



Source: Ocwen

## Loss Mitigation

» New appointment model for borrowers

» Proactive pursuit of modifications

» Low level of short sales, but rising

We view Ocwen's loss mitigation ability as Strong.

## Organizational Structure

Ocwen's home retention team has 852 employees; another 436 employees handle loan resolutions and underwriting.

Five servicing locations handle loss mitigation: Houston, Texas; West Palm Beach, Florida; Bangalore and Mumbai, India; and Montevideo, Uruguay. Around two thirds of Ocwen's loss mitigation staff is offshore.

The unit's staffing has grown since the last review. Different teams focus on specific types of loans and resolutions. Since the last review, Ocwen has created a specialized group to handle collateral-based resolutions such as short sales[1] and deeds in lieu[2] of foreclosure. The company also has consolidated within this group all offers under the Home Affordable Foreclosure Alternatives (HAFA) Program, a government program to facilitate short sales and deeds-in-lieu.

Agents handle inbound calls in a pooled environment to ensure that a loan resolution consultant is always available when a borrower calls. The only outbound calls the group makes are follow-up calls to borrowers pursuing workout alternatives.

Ocwen assigns HAMP modifications to consultants once the loss mitigation group receives complete financial packages from borrowers; it handles non-HAMP loans in a pool environment.

Ocwen's early loss mitigation group, a part of the loss mitigation group, offers modifications to borrowers who are less than 90 days delinquent or who it deems are at risk of imminent default.

Like the collections department, the loss mitigation group has extended hours of operation, with live agents available continuously from 3:00 p.m. EST Sundays through 7:00 p.m. EST Fridays and from 9:00 a.m. to 4:00 p.m. EST Saturdays.

## Strategies and Technology

Ocwen is still more active than many other servicers we rate in extending loss mitigation opportunities to borrowers.

Loans fall under the purview of the loss mitigation department at the time a borrower indicates that there is a potential or existing hardship, regardless of the delinquency status of the loan. Ocwen may pursue loss mitigation options and foreclosure simultaneously.

Customer service and collections agents receive training on pre-screening loan resolution calls and taking down borrower

financial information, and on when to transfer borrowers to the loss mitigation group.

Ocwen uses a consultative approach in working with borrowers in need of a resolution, which entails forming partnerships with community-based groups, participating in state government foreclosure initiatives, and attending local open houses and national homeownership preservation workshops.

Ocwen continues to expand its partnerships and add new affiliates to its partnerships with consumer advocacy groups to counsel and re-establish contact with delinquent borrowers. It prepares all documentation before mediation meetings with borrowers, as a number of states mandate, so that consultants can focus on reaching a resolution during the meeting.

Ocwen calls borrowers daily after the 20th day of delinquency. The company also conducts blast campaigns, or automated, unmanned calls, and sends letters to invite delinquent borrowers to local workshops and events in borrowers' zip codes to discuss loss mitigation alternatives face to face. Additionally, the loss mitigation group participates in specialized call campaigns, letter campaigns (in Spanish if appropriate), and mails borrowers DVDs detailing how to correctly complete and return a HAMP package.

The company sends a series of letters every month to borrowers in late stages of delinquency. As the delinquencies progress, the letters, which Ocwen developed with the help of the director of its consumer psychology department, become more frequent and the language takes on a greater sense of urgency. It sends these letters, which include solicitations for HAMP, to all seriously delinquent borrowers who do not have an active resolution pending.

Ocwen sends out loss mitigation packages, and the quality assurance team performs audits on the underwriting of all modifications. The audit team helps ensure compliance with investor guidelines, affirms the reasonableness of a workout option given the financial information a borrower submits, and confirms that it has received necessary management approval.

Borrowers can submit their financials to qualify for a workout option in a number of ways, including through Ocwen's website. The loan resolution and underwriting teams assess the reasonableness of borrowers' self-reported expenses using state-specific IRS tables, which results in loss mitigation alternatives that are more sustainable.

Ocwen then uses a proprietary loan resolution model to compare net present value calculations for the various loss mitigation options to an REO scenario. Loan resolution

consultants and underwriters use a modification calculator tool to identify the appropriate modification terms based on affordable payments and internal guidelines. The model includes workflow and document tracking, and automatically sends out letters to borrowers whose financial package submissions are missing documents.

The company orders a door knock on the 66th day of delinquency and every 60 days thereafter. Ocwen requests a property valuation on the 70th day of delinquency and an update every five months.

In September 2011, Ocwen implemented an appointment model, its version of single point of contact, for accounts in loss mitigation or foreclosure. Through this model, a customer care agent schedules a call between a borrower and a home retention manager who oversees loss mitigation efforts for that borrower. Borrowers can schedule subsequent calls with their home retention manager through the customer care unit.

### HAMP Strategy and Results

The company also offers resolutions through HAMP and HAFA.

To expedite the process, the company has automated the review of submitted packages through an evaluation of basic eligibility requirements for HAMP modifications. Loss mitigation agents solicit borrowers who do not qualify for a HAMP modification for other forms of modification, short sale or deed in lieu of foreclosure. Borrowers receive automated emails notifying them of the status of their HAMP application.

Ocwen has a government program committee, composed of all business unit leaders and the internal audit team, to ensure consistent communications with borrowers, improve procedures, and review the progress of its government-related programs. Since the last review, the company has also created a "government program operations manager" position to oversee the performance of the company's government programs.

According to the HAMP servicer performance report, through the end of March 2012, Ocwen had extended 97,173 offers of trial plans and started 55,924 permanent modifications, it had 5,650 active trial modifications and 39,466 active permanent modifications. The company also had an estimated eligible 60+ days' delinquent population of 57,129 borrowers, as well as 966 active trial modifications lasting six months or longer.

The conversion rate of trial plans to permanent modifications was 84% for eligible trials that started after 1 June 2010, when the US Treasury mandated the verification of income documentation prior to the start of trial plans, compared with an average conversion rate of 86% for servicers in the program.

Of the 28,740 borrowers whose HAMP modification trials Ocwen has cancelled, 6,671 received alternative modifications, 2,136 were on a repayment plan, and 387 were in the process of a short sale or deed in lieu of foreclosure. Of the 155,197 borrowers not approved for a HAMP trial modification, 60,217 were granted alternative modifications, 10,067 were on a repayment plan, and 2,909 were in the process of a short sale or deed in lieu of foreclosure. For borrowers who were not approved for a HAMP trial modification or whose trial modification the company cancelled, Ocwen was more likely than many of its peers to offer an alternative modification or repayment plan, and less likely to conduct a short sale or deed in lieu of foreclosure.

Ocwen also is an active participant in HAFA. As of 31 March 2012, the company had started agreements on short sale proceedings on 2,232 loans and completed agreements on 1,053 loans through this program. At the time of this review, Ocwen was testing monetary short sale incentives for borrowers.

### Loss Mitigation Options

The company is authorized by investors to pursue loss mitigation for the vast majority of the loans it services, and offers a wide range of modifications to both delinquent and current borrowers who it deems are at risk of imminent default. Aside from HAMP modifications, Ocwen offers borrowers alternatives for proprietary modifications, in the following order: 1) rate reductions; 2) term extensions; 3) maturity extensions; 4) balloon payments; 5) debt forgiveness; or 6) a combination of rate reduction and principal forgiveness. For quality control, the company reviews all modifications using an automated process.

Ocwen is proactive in pursuing streamlined modifications with borrowers in bankruptcy via borrowers' counsel, and offers borrowers modifications through their attorneys during motions for relief hearings. The company also receives automated referrals for loss mitigation opportunities from bankruptcy trustees and borrowers' counsel through its Default Mitigation Management Bankruptcy web portal. Since the last review, Ocwen has increased the monetary incentives it offers attorneys for loss mitigation referrals. Attorneys also receive a monetary incentive for helping to obtain missing HAMP documents.

In June 2010, the company eliminated the use of repayment plans and replaced them with full-debt modifications in which it capitalizes the amount past due, spreading the amount over the life of the loan rather than making it due immediately.

In July 2011, Ocwen announced its Shared Appreciation Modification (SAM) program, which uses principal forgiveness to restore borrowers' equity in their properties. SAM has a unique shared home appreciation feature that benefits investors. It reduces the unpaid principal balance to as low as 95% of the current home value by forgiving the excess amount in three equal annual increments, so long as the borrower remains current. The program's unique twist is that when the borrower sells the home or refinances the mortgage, investors receive 25% of any appreciation in the home's value from the time of modification; the borrower keeps the remaining 75%.

Ocwen also offers a full range of non-retention alternatives including a deed in lieu of foreclosure and short sale. To ensure that borrowers are aware of all potential resolution options, Ocwen requires contact with the borrower for all potential short sales.

## Performance Management

Incentive compensation for the loss mitigation group is based on a loan resolution consultant's ability to resolve loans, the number of HAMP submissions to the underwriting team, adherence to schedules, and loan workout defects. The monthly incentive may constitute as much as 40% of a consultant's salary.

The resolution rate is especially critical, as Ocwen deems a loan that goes to foreclosure sale a failure. Ocwen also factors into the incentive plan the loan resolution consultant's quality assurance score, which is based on call monitoring results. It ranks employees against their peers, with the top performers receiving additional compensation.

Newly hired consultants participate in two weeks of classroom training and are assigned a tenured associate for side-by-side training. Consultants also receive FDCPA training, for which they re-test semi-annually.

## Performance Metrics

Among the metrics that we use to evaluate a servicer's loss mitigation skills is the servicer's performance in resolving loans that are seriously delinquent. We also review the servicer's loss mitigation efforts, including third-party sales, short sales, and deeds in lieu. Exhibit 12 shows a static pool analysis of loans that were seriously delinquent as of 30 June

2010 and their status a year later. Ocwen's loss mitigation performance metrics are strong compared with those of its peers, and the company is proactive in granting modifications, including using principal reduction and offering subsequent modifications. The level of short sales, however, was low in comparison to that of its peers, although Ocwen increased it notably in April and May 2012.

EXHIBIT 12

### Ocwen Loss Mitigation Static Pool Performance

Status as of 30 June 2011 of Loans That Were 90+ Days Delinquent as of 30 June 2010

| | Total Cure[1] | Cash Flowing[2] | In Limbo[3] | Loss Mitigation[4] | Loss with No Loss Mitigation[5] |
|---|---|---|---|---|---|
| Subprime | 18% | 43% | 22% | 2% | 15% |

[1] Includes "current" and "paid in full."
[2] Includes "minor delinquency," repayment plans, and modifications
[3] Includes "90+ day delinquency" and "foreclosure."
[4] Includes "third party sale," "short sale/short payoff," and "deed-in-lieu."
[5] Includes "REO sold from foreclosure," "in REO from foreclosure," and "charge-offs."

Source: Ocwen loan-level data

## Foreclosure, Bankruptcy and REO Timeline Management

» Centralized handling of affidavits

» Solid foreclosure timelines, weaker REO timelines

» Foreclosure-related documents ordered early to expedite foreclosure filings

We view Ocwen's foreclosure and REO timeline management as Above Average.

## Organizational Structure

Ocwen's default servicing unit handles foreclosure processing. The unit is responsible for providing control, expertise, and managing foreclosure, bankruptcy, eviction and title resolution procedures. The pre-foreclosure group has 25 employees, the foreclosure group, 460. The REO group, staffed with 327 full-time equivalents, is segregated into pre-marketing, marketing, closing and expense management teams.

## Foreclosure

Ocwen makes wide use of technology in its default servicing area. Attorneys have access to the REALResolution™ system, with event tracking. The company uses a matrix to track legislative and regulatory changes at the state level.

To accommodate new state rules, on the 60th day of delinquency, Ocwen orders loan documents such as the

original note and mortgage documents to facilitate foreclosure filings.

Following an automated review, a pre-foreclosure committee, consisting of two foreclosure coordinators on the consumer ombudsman team, reviews all loans after the 80th day of delinquency, prior to initiating foreclosure. The committee reviews all loans for compliance, legal issues, and predatory lending practices, and to ensure that all attempts for loss mitigation have been exhausted.

Ocwen's policy is to refer loans to foreclosure on the 92nd day of delinquency. It assigns loans to a network of attorneys and tracks milestones through a foreclosure module in REALResolution™. The company monitors attorney performance through quarterly scorecards, and attorneys must submit chronology reports to the company if they miss any deadlines. Control reports also determine the reasons for hold times, to identify the causes of significant delays so that the company can take corrective action. Although Ocwen's vendor management program is solid, other servicers we rate monitor attorney performance more frequently, often with monthly scorecards.

Since the last review, Ocwen has enhanced its handling of foreclosure-related affidavits. The company has hired a dedicated attorney and several paralegals to manage changes in state requirements and to improve Ocwen's communications with outside foreclosure counsel. It has also developed a training curriculum to provide staff with a deeper understanding of document execution. Finally, Ocwen created a dedicated "signing room" for executing all documents associated with the foreclosure process.

## Bankruptcy

The bankruptcy group has a staff of 245. Ocwen uploads a daily report of new bankruptcy filings and closed bankruptcies that it receives from Aacer® to its REALResolution™ system. Ocwen files the proof of claims in bankruptcy courts electronically, which makes the process more efficient. The referrals that Ocwen sends to attorneys to file motions for relief are also automated, with all information auto-populated.

## REO

The correspondence, agreements and contracts for the pre-marketing, marketing, closing, and expense management teams are all standardized and make use of comprehensive workflow management. The company typically transfers loans to REO within two days of the foreclosure sale. It assigns properties to real estate agents based on their performance and ranking among other agents working with Ocwen.

Ocwen also markets its properties through its own REO website as well as through a number of third-party websites. Buyers may submit their purchase offers to Ocwen directly through the website. The company has enhanced the features of its REO website since the last review; among other things, the website now allows buyers to see other buyers' offers, encouraging a competitive bidding environment.

Ocwen manages the potential buyers' bidding process for REO properties and communication with agents via REALTrans®, a proprietary order tracking and vendor management system. It uses REALResolution™ to automatically create and send out listing agreements and to download offers submitted through Ocwen's REO website.

The company uses a cash-for-keys program that offers borrowers a cash incentive to vacate the property. This allows Ocwen to avoid delays and expenses related to the eviction process. The use of cash-for-keys reduces a property's carrying costs.

To determine a property's list price, Ocwen obtains two property values and has a licensed appraiser validate them. Additionally, the assigned agent conducts an on-site inspection every two to three weeks while the loan is in REO; an independent agent also conducts monthly inspections. Ocwen uses its proprietary net present value model to create a marketing strategy for each property.

Ocwen's REO staff conducts site visits to areas with high concentrations of REO properties. The company is flexible in providing special incentives for the expedited disposition of select REO assets, including a bonus commission to the selling agent, assistance with a buyer's closing costs, and credits for repairs and appliances.

## Timeline Management Metrics

We measure servicers' timeline management during a 12-month period on a state-weighted basis and compare servicers by product type. Exhibit 13 shows the results of our analysis of Ocwen for subprime loans.

EXHIBIT 13

### Ocwen Average Foreclosure-REO Timeline Information

| Foreclosure Referral | Subprime |
|---|---|
| Average days from missed payment to foreclosure referral | 179 |
| **Foreclosure referral to sheriff sale** | |
| Foreclosure referral to sheriff less Freddie timeline | 194 |
| **Real estate owned (REO)** | |
| Average a property is REO (excluding redemption) | 243 |
| Total days | 616 |

Source: Ocwen loan-level data

The company's foreclosure sale and REO timeline metrics have deteriorated since the last review, as have the metrics for most of the other servicers we rate. However, Ocwen's days to referral metric has improved. Overall, Ocwen's performance for first lien subprime loans was Above Average.

### Missed Payment to Foreclosure Referral

We consider the period from missed payment to foreclosure referral an indication of the speed at which a servicer refers a borrower to foreclosure. On average, Ocwen referred loans to foreclosure on the 179th day of delinquency, which is quick in comparison to its peers.

### Foreclosure Referral to Foreclosure Sale

The period between the foreclosure referral and the sheriff sale measures the efficiency at which the servicer can achieve REO from a corresponding foreclosure action. This period is significantly influenced by property location and by delays that can be outside the servicers' control. We neutralize the impact of location on a servicer's ability to manage the foreclosure process by measuring servicers' foreclosure timelines relative to a state-weighted Freddie Mac timeline.

On average, the period from foreclosure referral to sheriff sale for Ocwen's loans exceeded the Freddie Mac timeline, with no delays, by 194 days, an above average result in comparison to peers. Twenty-six percent of Ocwen's foreclosures experienced delays beyond the company's control. When analyzing a servicer's foreclosure timeline, we evaluate loans with and without delays, the proportion of loans with delays, and their subsequent effect on timeline performance.

### REO Acquisition to Disposition, Net of the Redemption Period

A property enters REO when a servicer purchases it at the foreclosure sale, after any applicable redemption period. The time from acquisition of REO to liquidation is directly affected by the number of properties subject to eviction as well as by property quality and location. On average, Ocwen liquidated its REO loans (excluding the redemption period) in 243 days, a longer period in comparison to most of its peers.

## Loan Administration

» Some tax-related functions brought in house

» Force-placed insurance cycle includes certified letter

» Use of DataMart eliminates potential manual errors in remittance process

### Payment Processing

Ocwen's cashiering department, staffed with 65 full-time equivalents, is responsible for processing the borrower payments it receives at its West Palm Beach office. Ocwen receives and posts over 94% of its borrower payments automatically via lockbox, Speedpay, MoneyGram®, Western Union, ACH, and a variety of other bill payer services as well as wire transfer. The balance of payments comes through its website, IVR, or by manual posting. Ocwen uses a lockbox operated by Regulus, in Carol Stream, Illinois. The firm posts more than 99% of its payments within 24 hours of receipt.

Ocwen has a separate, limited-access facility for check processing at West Palm Beach. As an added measure of security, the company also has cameras installed throughout the cashiering department.

### Loan Boarding

Ocwen's loan setup and quality control unit manages both incoming and outgoing servicing transfers and works to ensure that the controls in place for data integrity at conversion are adequate. More than 99% of loans boarded with Ocwen are boarded via a highly standardized, systematic process. The team receives and reviews preliminary boarding tapes from the prior servicer and then boards a "shell loan" to the REALServicing® system no later than 10 days before the scheduled transfer date. It boards final data and activates loans in the system no later than four business days after the scheduled transfer date.

Ocwen obtains all available imaged documents from the prior servicers. If imaged documents are not available, Ocwen scans the entire loan file.

REALServicing® also sets up the terms of HAMP and non-HAMP modified loans. Since the last review, Ocwen has updated the instructions for incoming transfers to request data points and information for loans involved in HAMP: terms of the proposed agreement, modified terms, denial information and all relevant documentation.

## Document Management

Ocwen's imaging services team has 40 full-time equivalents and 54 staff on contract as of 31 May 2012. The company images the entire servicing file, which it makes available internally, as well as to tax, insurance, foreclosure and bankruptcy vendors via a secure website. The imaging team images files within 30 days of loan boarding, and manages them using a barcode system. When possible, the company obtains images electronically from prior servicers. When files are not available electronically, Ocwen scans the entire file.

A file transfer database tracks all files the company receives. To ensure high-quality performance from its vendors, Ocwen holds weekly performance meetings with its imaging and document storage vendor. It tracks all collateral files and documents via a collateral management system that tracks document recording information. The company also conducts regularly scheduled inventory checks to ensure the accuracy of the collateral file inventory.

## Investor Reporting

Ocwen's investor reporting group, which consists of 105 employees, is responsible for reporting, as well as sending remittances to investors and trustees based on the terms of each pooling and servicing agreement. The unit also produces supplemental internal reports to validate the accuracy of trustee-prepared distribution reports. The investor remittance group is separate from the investor reconciliation group; its remittance and reconciliation functions are thus also separate, which we consider best practice.

The team uses DataMart software for investor reporting, to eliminate potential manual errors in the remittance process. DataMart automatically downloads information directly from Ocwen's systems, consolidates it in a single database, and makes all necessary loan-level calculations. Ocwen also maintains an excellent investor website that allows investors to access data and reports for their Ocwen-serviced portfolios. The website allows access to both current and historical data, including remittance, origination, performance, and loan level data. Investors may access daily or monthly; they may also access on-demand reports.

## Bank Reconciliations

Ocwen reconciles its payment clearing accounts and escrow disbursement clearing accounts daily, and its P&I trust custodial accounts, monthly. At the time of this review, the company had no custodial account reconciliation items aged more than 91 days; it had 4,776 items aged less than 30 days; 707 items aged between 31 and 60 days; and 736 items aged between 61 and 90 days.

## Tax and Insurance

The company has 138 full-time equivalents in its tax and insurance groups. In November 2010, Ocwen transitioned from outsourcing all of its tax functions to CoreLogic and brought some of its tax-related processes back in-house, among them making calls; processing incoming mail, faxes and emails; conducting research; and contacting delinquent borrowers of non-escrowed loans.

Seventy-three percent of Ocwen's first-lien portfolio is escrowed for taxes or insurance. Ocwen's customer service call center routes tax-related calls from borrowers and research requests.

Ocwen outsources all of its hazard and flood insurance processing to Assurant Solutions. The process involves insurance tracking and a three-letter cycle (the second of which the company sends by certified mail) and phone calls before insurance is force placed between the 90th and 136th day after expiration of the initial insurance policy. At the time of this review, Ocwen had a 13.8% flat cancellation rate for its force-placed hazard insurance policies, cancelling those policies once the borrower provided proof of existing insurance. Ocwen does not directly earn a commission for force-placing insurance. The company maintains a blanket hazard insurance policy from Assurant for all of its junior liens.

Ocwen has merged all of its vendor management functions into a single department that focuses on reducing costs, making process improvements, and conducting due diligence on vendors. The company has an excellent vendor management program, which includes call monitoring, bi-weekly meetings, workflow reviews, control reports, and periodic site visits. Additionally, Ocwen's internal audit group reviews the tax and insurance vendors' performance, while the quality assurance team monitors vendors' agents' calls.

## Servicing Stability

» Acquisitions leading to rapid growth in servicing portfolio

» Solid financial metrics and performance

» HLSS to facilitate even more portfolio growth

We assess Ocwen's servicing stability as Below Average. Our downgrade to the Special Servicer assessment and the review for downgrade are due to concerns related to the rapid growth of Ocwen's servicing portfolio and the challenges it faces in